**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DAVID M. SCATES,**

**Plaintiff,**

**v.**                                                    **Civil Action No. 1:17cv22
                                                          (Judge Kleeh)**

**K. CRADDOCK; J. DURANKO,**
SIS Tech. FCI Morgantown**; WARDEN
TERRY O'BRIEN,** Hazelton, SPC**;
ANN MARY CARTER,** FCI Morgantown**;
M. VELTRI,** CMC Morgantown**; UNIT
MANAGER DAVID SWEENEY,** Hazelton
SPC**; SIS TECH JIM ERVIN; UNITED
STATES OF AMERICA, CHARLES
SAMUEL,** Director BOP**; THOMAS KANE,**
Interim Director BOP**; BRANDON FLOWER**,
Assistant United States Attorney**; IAN CONNERS**,
National Administrator Administrative Remedy**;
HARRELL WATTS,** National Administrator
Remedy**;**

**Defendants,**

**REPORT AND RECOMMENDATION**

**Procedural History**

The Plaintiff initiated this action on July 27, 2015, by  filing a complaint in the

United States District Court for the District of South Carolina raising claims pursuant to

42 U.S.C. § 1983; Bivens; and the Federal Tort Claims Act ("FTCA").  The complaint

and the amended complaint, that the Plaintiff filed on August 28, 2015, concerned

actions that allegedly happened at FCI Estill in South Carolina and FCC Hazelton and

FCI Morgantown both of which are in West Virginia.

The individual defendants named by the Plaintiff were Kenneth Craddock, former

Case Manager at FCC Hazelton; Jeffrey Duranko, former Special Investigative Services

("SIS") Technician at FCI Morgantown; Marilyn Veltri, Case Management Coordinator ("CMC") at FCI Morgantown; David Crickard, former Executive Assistant/Camp Administrator at FCI Estill; David Sweeney, Unit Manager at FCC Hazelton; and James Ervin, SIS Technician at FCC Hazelton.  In addition to the above-named individuals, the Plaintiff named the Federal Bureau of Prisons ("BOP"), the United States of America[1], and John and Jane Doe as defendants. On February 17, 2017, the District of South Carolina dismissed the matter without prejudice as it pertains to Defendants John Doe, Jane Doe, Crickard and the BOP and transferred the case against Craddock, Duranko, O'Brien, Carter, Veltri, Sweeney, Ervin and the United States of America to this Court. Prior to the transfer, the Plaintiff paid the $350 filing fee.

After the case was transferred here, the Plaintiff was sent an order advising him of the potential consequences of pursuing both a FTCA claim and Bivens action. ECF No. 81. On that same date, the Plaintiff's motion to amend was granted,  and he was directed to refile his complaint on this court's approved form. ECF No. 82. On May 18, 2017, the Plaintiff notified the court of his election to proceed under both the FTCA and Bivens. On May 22, 2017, the Plaintiff filed his Bivens complaint and FTCA complaint on the court approved forms. ECF Nos. 89, 90. On June 5, 2017, the Plaintiff filed an amended court-approved Bivens complaint and an amended court-approved FTCA complaint. ECF Nos. 94, 95. In addition to the individual defendants named in his original complaint, the Plaintiff named Mary Ann Carter, Warden FCI Morgantown; Charles Samuel, BOP Director; Thomas Kane, Interim BOP Director; Brandon Flower,

---

[1] The District of South Carolina granted the Plaintiff's motion to amend (ECF No. 70) to add the United States of America as a defendant on the claims under the FTCA.

Assistant United States Attorney; Ian Conners, National Administrative Remedy

Coordinator; and Harrell Watts, National Administrator Administrative Remedy.

On May 24, 2018, following a preliminary review of the Plaintiff's complaints, the

undersigned concluded that summary dismissal was not appropriate and an Order to

Answer or Otherwise Plead was entered. ECF No. 98. Sealed summonses were issued

for the individual defendants and the United States of America. On September 27, 2018,

the Defendants filed a Motion to Dismiss or, in the alternative, Motion for Summary

Judgment. ECF No. 126. An Order and Roseboro Notice was issued on September 28,

2018. ECF No. 127.  On October 23, 2018, the Plaintiff filed a Reply to the Defendants'

alternative motions. However, on November 13, 2018, the Roseboro Notice was

returned marked: "Return to Sender/Unclaimed/Unable to Forward." ECF No. 134. On

March 28, 2019, a second Order and Roseboro Notice was sent to the Plaintiff via

certified mail, return receipt requested. The green card has never been returned, and

the USPS website indicates that the envelope has been awaiting delivery scan since

April 2, 2019 at 1:30 p.m.[2]

### Contentions of the Parties

#### A.  Complaint

In support of his Bivens complaint, the Plaintiff makes two claims. First, he alleges

that Defendants Veltri, Carter, Conners, Watts, Samuel, Kane, Duranko and O'Brien

each individually and collectively violated his rights under the First Amendment by

prohibiting him from publishing byline articles and contacting the news media. In

---

[2] According to the BOP website, the Plaintiff was released on January 18, 2019. The *pro se* law clerk assigned to this matter verified with probation that the Plaintiff continues to reside at the address noted on the docket sheet, which is the address to which both Roseboro notices were mailed.

addition, the Plaintiff alleges that the Defendants prohibited him from publishing byline articles on the Internet. It appears that the Plaintiff sought to contact the local newspaper and other media outlets to expose misconduct by BOP staff, including "squandering of public funds on staff parties, internet use during working hours, conversion of property and criminal actions." ECF No. 94 at 12. The Plaintiff's second claim is that Defendants Duranko, Sweeney, Craddock, Flower, O'Brien and Ervin, individually and collectively, conspired to violate his Due Process and Sixth Amendment rights by submitting false records to the District Court, forging documents for use in his criminal prosecution, forging an affidavit for appointment of counsel, and failing to advise him that he was being interviewed on behalf of the United States.[3]  The Plaintiff further alleges that Defendants O'Brien, Sweeney and Ervin retaliated against him[4] for "wishing to assert his First and Sixth Amendment rights and as a result of [him] informing the United States Attorney that the Defendants were incompetent, fleckless, individuals who were readily identifiable as maladroit in their official and individual capacities." ECF No. 94 at 17. For relief, the Plaintiff seeks injunctive relief to prohibit any incorrect program statements and inmate A&O handbooks nationwide and $50,000 from each of the individual defendants.

---

[3] A criminal case was opened against the Plaintiff on March 14, 2013 in this District charging him by way of information with possession of a prohibited object as defined by 18 U.S.C. § 1791(d)(1)(F), to wit, a phone and other device used by a user of a commercial mobile service. See Criminal Case 1:13-cr-00058-JSK. On October 8, 2013, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, and by leave of Court, the United States dismissed the Information with prejudice because the [Plaintiff] provided exculpatory evidence that called into doubt the credibility of evidence developed by the United States.

[4] The Plaintiff alleges that the retaliatory action was changing or causing his custody and security level to be changed and was intended to ensure that he was subjected to a higher security transfer under close supervision.  The Plaintiff further alleges that Defendant Ervin authored a SIS report indicating that if he was released back to camp, he would continue to break policy and obtain another cellular phone. ECF No. 94 at 16-17.

With respect to his FTCA complaint, the Plaintiff effectively reiterates the same claims as alleged in his <u>Bivens</u> complaint. More specifically, his first allegation is that Defendants Veltri, Carter, Conners, Watts, Samuel, Kane, Durando and O'Brien violated his First Amendment Rights to publish under a byline and to publish under a byline on the Internet. As supporting facts, the Plaintiff alleges that these Defendants negligently failed to comply with internal BOP policy, well established case law and statutory provisions. The Plaintiff maintains that in doing so, their conduct directly cost him the funds he paid for legal copies, expenses during pro se representation and otherwise violated his rights. In addition, the Plaintiff alleges that employees of the BOP forged court documents to secure a criminal conviction, improperly investigated a criminal matter at the direction of the United States Attorney, were negligent, inflicted intentional emotional distress and these actions constituted an abuse of process. In describing his injury as the result of his two claims, the Plaintiff states that "[he] incurred cost associated with legal fees for the criminal action; [he] was not able to publish articles, through sales of manuscripts of these articles; [his] First, Fifth and Sixth Amendment rights were violated; BOP employees were allowed [to] create an untenable situation where they failed to do what they were paid to do and then lie and forge documents to ensconce their egregious and disgusting conduct; suffered emotional distress as well." ECF No. 95 at 18. For relief, the Plaintiff is requesting monetary compensation in the amount of $10,000; $9,501.00 and $9,500.00.[5]

---

[5] Based on the attachments to the FTCA complaint, it appears that the Plaintiff filed three administrative tort claims. The first was received at the Regional Office on August 22, 2013 and requested $9,501.00 for the alleged violation of his constitutional rights by being prohibited from publishing under a byline. It was denied on November 5, 2013. ECF No. 95-7. The second was dated September 14, 2014 and requested $9500 with respect to his allegation that staff willfully and intentionally forged an Inmate Intake Form. That claim was denied on January 29, 2015.

**B. <u>Motion to Dismiss or, in the Alternative, for Summary Judgment</u>**

In support of their motion to dismiss or, in the alternative for summary judgment, the Defendants allege:

1. The Plaintiff's First Amendment claim that he was not allowed to publish under a byline is a new <u>Bivens</u> context, and therefore, is not cognizable in a <u>Bivens</u> lawsuit;

2. The Plaintiff's complaints as to alleged misconduct regarding his federal criminal investigation must be dismissed because the allegations fail to state a cause of action and are meritless;

3. The Plaintiff's allegations regarding his custody classification must be dismissed because prisoners have no constitutional right to be incarcerated in the housing or custody level of their choice;

4. Former Assistant United States Attorney Brandon Flower has absolute immunity against the Plaintiff's claims;

5. The Plaintiff's <u>Bivens</u> claims against all Bureau Defendants should be dismissed because those Defendants are entitled to qualified immunity;

6. The Plaintiff's FTCA claims must be dismissed for lack of jurisdiction because he never suffered a physical injury as required by statute.

**C. <u>The Plaintiff's Reply</u>**

First, with respect to his claim regarding publication under a byline, the Plaintiff alleges that the Supreme Court has never articulated a standard that would absolutely

---

ECF No. 96-4.  The third was dated December 1, 2014 and requested $10,000 and alleged that Hazelton staff members conspired to forge documents to obtain a federal conviction in the case of <u>United States v. David Scates</u>, 1:13-cr-58 (NDWV).  Apparently, it was denied in the same January 29, 2015 letter. <u>Id.</u>

prevent a prisoner from pursuing a <u>Bivens</u> claim for a violation of the First Amendment. In addition, he alleges that even if his claim is considered to be new, "this Court must examine whether there is an 'existing process for protecting the [relevant] interest [which] amounts to a convincing  reason for the judicial branch to refrain from providing a new freestanding remedy in  damages'" and must consider whether there are any special factors that should be applied that would prevent this Court from intervention. ECF No. 132 at p. 4.

With respect to his allegations  regarding misconduct on the part of various defendants in the criminal investigation of his possession of a cell phone, the Plaintiff maintains that under BOP Rules and the Code of Federal Regulations, once there is an inquiry of a criminal nature, the Internal Bureau of Prisons must stop their investigation until the United States Attorney or the Federal Bureau of Prisons completes its investigation, and the BOP has no authority to interfere in a criminal investigation. The Plaintiff further notes that while the Defendants admit that AUSA Flowers enlisted and directed Defendant Duranko to conduct affairs on behalf of the United States, they fail to address the fact that Duranko never advised him that he was working for the United States in a criminal prosecution. Moreover, the Plaintiff alleges that Duranko filled out the request for an attorney form and then forwarded the form to the United States Attorney, who filled out the relevant sections of the form to achieve the desired outcome of appointment of counsel.   He also again alleges that documents were forged, and the Court was provided with spurious information. Specifically, the Plaintiff maintains that the form indicating that he received an Admissions and Orientation  Handbook upon his arrival at the minimum security camp within FCC Hazelton was forged. Finally, in

response to the Defendants' argument that he fails to state a claim for "malicious prosecution" under the Fourth Amendment because probable cause existed when the cell phone was seized, and he admitted the cell phone was his and intended to plead guilty, the Plaintiff appears to argue that any such exchange would have pertained to a chargeable offense within the BOP and not to a criminal violation.

With respect to his allegations regarding his custody classification, the Plaintiff acknowledges that although a prisoner may have no right to be housed at any particular prison, it is well established that a prisoner cannot be  transferred to a higher security facility in retaliation for exercising constitutional rights. The Plaintiff maintains that after his federal criminal case was dismissed, there was no basis to raise his security based on a SIS report conducted post prosecution that indicated if he was released back to a minimum security camp, he would obtain another cell phone. Instead, the Plaintiff argues that Defendants Ervin, Sweeney and O'Brien did so for the express purpose of punishing him for "his accusations, grievances and the outcome of the criminal prosecution." ECF No. 132 at 14.

With respect to Defendant Flowers, the Plaintiff concedes that prosecutors have absolute immunity in their respective decisions to prosecute, but immunity is not directed at every element attached thereto. The Plaintiff maintains that his absolute immunity was undermined when he forged the financial affidavit and presented it to the Court.

With respect to his FTCA claim, the Plaintiff maintains that the United States has erroneously characterized the claim that he set forth.  Specifically, the Plaintiff alleges that he relies upon 28 U.S.C. § 1346(a)(2) which provides him with the ability to file an

action or claim against the United States for an amount not exceeding $10,000. Furthermore, the Plaintiff maintains that his action did not set forth any claim for mental or emotional injury but instead sought other damages that resulted from the conduct of employees of the BOP. Accordingly, the Plaintiff argues that it would be improper to dismiss his action based on 28 U.S.C. § 1346(a)(2). The Plaintiff concludes by arguing that he need only articulate a claim founded upon the Constitution and for an amount not exceeding $10,000, which he maintains he has done.

## **Legal Standard**

A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir.1993); <u>See Also</u> <u>Martin</u> at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." <u>Conley</u> at 45-46. In <u>Twombly</u>,

9

the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly at 554-55. Therefore, for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003).  In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).  Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" to meet the plausibility standard and survive dismissal for failure to state a claim.  Id.

The Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal

arguments for her. <u>Small v. Endicott</u>, 998 F.2d 411 (7th Cir. 1993). Nor should a court

"conjure up questions never squarely presented." <u>Beaudett v. City of Hampton</u>, 775

F.2d 1274 (4th Cir. 1985).

 B. <u>Motion for Summary Judgment</u>

 Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary

judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). In applying the standard for summary judgment,

the Court must review all the evidence "in the light most favorable to the nonmoving

party." <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid

weighing the evidence or determining the truth and limit its inquiry solely to a

determination of whether genuine issues of triable fact exist. <u>Anderson v. liberty lobby,

Inc.</u>, 477 U.S. 242, 248 (1986).

 In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden

of informing the Court of the basis for the motion and of establishing the nonexistence of

genuine issues of fact. <u>Celotex</u> at 323. Once "the moving party has carried its burden

under Rule 56, the opponent must do more than simply show that there is some

metaphysical doubt as to material facts." <u>Matsushita Electric Industrial Co. V. Zenith

Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific

facts showing the existence of a genuine issue for trial. <u>Id</u>. This means that the "party

opposing a properly supported motion for summary judgment may not rest upon mere

allegations or denials of [the] pleading, but...must set forth specific facts showing that

there is a genuine issue for trial." <u>Anderson</u> at 256. The "mere existence of a scintilla of

11

evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.    To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).  Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation.  Anderson at 248.  Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita at 587.

## Analysis

### A.  Bivens-First Amendment Claim

In 42 U.S.C. § 1983, Congress provided a specific damage remedy for Plaintiffs whose constitutional rights were violated by state officials, but Congress provided no corresponding remedy for constitutional violations by agents of the Federal Government. Eventually, the Supreme Court issued its opinion in Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) and recognized for the first time an implied right of action for damages against federal officers to compensate persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. 403 U.S. 388, 397 (1971). The Court acknowledged that the Fourth Amendment does not  provide for money damages "in so many words." Id. at 396. The Court noted, however, that Congress had not foreclosed a damages remedy in "explicit" terms and no "specific factors" suggested that the Judiciary should "hesitat[e] in the face of congressional

silence. Id. at 396-97. Accordingly, the Court held that it could authorize a remedy under general principles of federal jurisdiction. See id. at 392.

Over the next nine years, the Court allowed Bivens-type remedies twice more, in a Fifth Amendment gender discrimination case, Davis v. Passerman, 422 U.S. 228 (1979) (an administrative assistant sued a Congressman for firing her because she was a woman), and in an Eighth Amendment cruel and unusual punishment clause case, Carlson v. Green, 446 U.S. 14 (1980) (a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma).

For nearly four decades, the Supreme Court has "consistently refused to extend Bivens to **any new context** or new category of defendants." Ziglar v. Abbasi, 127 S.Ct. 1843, 1857 (2017). (citations omitted) (emphasis added). Moreover, in Abbasi, the Supreme Court reiterated the significant limits to Bivens liability, cautioning courts to first consider whether to imply a remedy at all before reaching the merits of such claims. 137 S.Ct. 1843 (2017). The court left no doubt that expanding the personal liability associated with Bivens is "a 'disfavored' judicial activity." Id. at 1857 (citations omitted). The Court specifically noted that "in light of the changes" to its "general approach" to "implied damages remedies," the analysis in Bivens, Davis, and Carlson might be "different if they were decided today." Id. at 1856. See also Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 67 & n. 3 (2001) (noting that Bivens relied "largely on earlier decisions implying private damages actions into federal statutes" from which the Supreme Court has since "retreated.").

As this Court recently noted, Abbasi "marked a substantial shift in how courts are to interpret allegedly unconstitutional acts by federal actors when there is no statute

permitting a damages remedy." Holloway v. Coakley, et al., Case No. 2:17-CV-74, Order Dismissing Case, ECF No. 73 (N.D.W. Va. Apr. 8, 2019). Specifically, Abbasi "narrowed the circumstances in which a plaintiff may successfully state a claim under principles established in Bivens." Atkinson v. Holder, No. 18-1677, 2019 WL 1292886, at *11 (4th Cir. Mar. 21, 2019) (citing Abbasi, 137 S.Ct. at 1857-58).

After Abbasi, there is now a two-step test when deciding whether a cognizable Bivens remedy exists for alleged official misconduct. First, a court must determine whether the claim presents a "new" Bivens context. Id. at 1859. If it does, the court must assess whether any "special factors counsel[ ] hesitation" in recognizing a new remedy "in the absence of affirmative action by Congress." Id. at 1857, 1859. Therefore, if the Bivens claim meaningfully differs from "a claim against an FBI agent for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; [or] a claim against prison officials for failure to treat an inmate's asthma," it is a new context. Id. at 1860.

In considering whether any special factors counsel hesitation in authorizing a damages remedy, this inquiry concentrates on "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 1858. When asserting an implied cause of action under the Constitution, such as a Bivens, a separation-of-powers analysis is central to the inquiry. See id. at 1857. The question becomes who should decide whether to provide a damages remedy—Congress or the Court. Id. "The answer most often will be Congress," id., because it "is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability

claims." Id. at 1858. Moreover, the Abbasi decision instructs the lower courts that if claimants have alternative remedial structures, "that alone may limit the power of the Judiciary to infer a new Bivens 'cause of action.'  In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy[,] . . . the courts must refrain from creating  the remedy in order  to respect the role of Congress." Id.

In the instant case, the Plaintiff alleges that Defendants Veltri, Carter, Conners, Watts, Samuel, Kane, Duranko and O'Brien violated his First Amendment rights in prohibiting him from publishing under a byline.  A First Amendment claim is markedly different from the claims asserted in Bivens, Davis, and Carlson, the three cases  in which the Supreme Court has authorized Bivens liability.  Furthermore, the Supreme Court has never recognized a First Amendment Bivens claim.  See Reichle v. Howards, 566 U.S. 658 (2012) ("We have never held that Bivens extends to First Amendment claims.").

Considering Abbasi, appellate courts have unanimously classified First Amendment claims as a new Bivens context.  See, e.g., Rager v. Augustine, 760 F. App'x 947 (11th Cir. 2019) (noting that "it is by no means clear that a damages remedy is warranted for a First Amendment retaliation claim"); Vanderklok v. United States, 868 F.3d 189, 199 (3d Cir. 2017) (noting that "the existence of a Bivens action for First Amendment retaliation is no longer something that we should assume without deciding"); Bristran v. Levi, 912 F.3d 79, 95-96 (3rd Cir. 2018) (a prisoner case, reasoning that "from the vantage of boundaries set by the [United States] Supreme Court, [the plaintiff's] First Amendment retaliation claim is novel"); Vega v. United

States, 724 F. App'x 536, 539 (9th Cir. 2018) (holding that prisoner's First Amendment claim "is different in a meaningful way from previous Bivens cases."). Moreover, '"[n]ationwide, district courts seem to agree that, post-Abbasi, prisoners have no right to bring a Bivens action for violation of the First Amendment.'" Rhodes v. USA, No. 10-CV-50-JPG, 2019 WL 1552986, at *3 (S.D. Ill. Apr. 10, 2019) (quoting Harris v. Dunbar, Case No. 17-cv-536-WTL, 2018 WL 3574736 at *3 (S.D. Ind. July 25, 2018).

The undersigned agrees with the reasoning of these decisions and concludes that the Plaintiff's First Amendment claim arises in a new context for which the Supreme Court itself has not authorized Bivens liability. Therefore, this Court must determine whether any special factors counsel hesitation in authorizing a damage remedy for a First Amendment claim.

Abbasi demonstrates that alternatives may restrict the Judiciary's need to create a new damages remedy. See id. at 1865 ("[T]he existence of alternative remedies usually precludes a court from authorizing a Bivens action."). This is true even where that alternative provides incomplete relief or no relief at all. Id. at 1858 (citations omitted)); Bush v. Lucas, 462 U.S. 367, 385-88 (1983) (creation of a Bivens remedy does not hinge on whether an alternative, existing process offers "complete relief for the plaintiff"); Wilkie v. Robbins, 551 U.S. 537, 550 (2007).

Congress specifically created an alternative process for prisoners to address grievances when it passed the Prison Litigation Reform Act ("PLRA") to limit prisoner litigation. Montcalm Pub. Corp. v. Commonwealth of Va., 199 F.3d 168, 171 (4th Cir. 1999), Woodford v. Ngo, 548 U.S. 81, 94 (2006). The PLRA reflects a legislative determination that "this country needs……… fewer and better prisoner [law] suits."

McLean v. United States, 566 F.3d 391, 403 (4th Cir. 2009) (quoting Jones v. Bock, 549
U.S. 199, 203 (2007)). The PLRA seeks to limit inmate litigation and to remove federal
district courts from the daily operation of prisons. McLean, 566 3d at 403 (citations
omitted). Accordingly, the PLRA created an administrative process that empowers a
prisoner to voice concerns about his or her confinement. Woodford, 548 U.S. at 94; See
28 CFR §§ 542.10-542.19. Specifically, the BOP administrative grievance process
"allow[s] an inmate to seek formal review of **any aspect** of his/her own confinement." 28
CFR § 542.10(a) (emphasis added). Where an inmate is not satisfied with how the staff
at his correctional facility responds to his concerns, the inmate can appeal his grievance
through several additional levels of review outside of his correctional facility. See 28
CFR §§ 542.13-542.15.

Therefore, the Plaintiff had alternative methods to pursue his allegations. In fact,
many courts have explicitly recognized that the BOP's administrative remedy program is
an alternative process that precludes a Bivens remedy. See Begay v. Leap, No. 3:17-
CV-2639-N-BT, 2019 WL 131-8410, at *3 (N. D. Tex. February 26, 2019) (citations
omitted); Brunson v. Nichols, No. 1:14-CV-2467, 2018 WL 728-6410, at *3 (W. D. La.
Dec. 7, 2018) (citing Vega v. United States, 881 F.3rd 1146 (9th Cir. 2018); Gonzalez v.
Hasty, 269 F.Supp.3d 45, 60 (E.D.N.Y. 2017); Andrews v. Miner, 301 F.Supp.3d 1128,
2017 WL 768-8266, at *4 (E. D. Ala. Aug. 5, 2017); Mohammed v. Gherke, 2018 WL
1334936, at *4 (S. D. Ind. Mar. 5, 2018); Ashford v. Travesio, 2018 LEXIS 18500, at *12
(D. Ariz. Feb 2, 2018); Buenrostro v. Fajardo, 2017 WL 6033469, at *3 (E. D. Cal. Dec.
5, 2017); Crowder v. Jones, 2017 WL 588-9717 at *3 (S. D. Ind. Nov. 29, 2017). The
undersigned proposes that this Court adopt that reasoning and find that an alternative

process exists to protect the Plaintiff's interest and counsel's hesitation in recognizing a new remedy. Accordingly, the Plaintiff's <u>Bivens</u> complaint as it relates to his First Amendment claim should be dismissed.

**B. <u>Bivens-Alleged Misconduct Regarding Federal Criminal Investigation</u>**

The following facts do not appear to be in dispute. On April 23, 1999, in the United States District Court for the Eastern District of Virginia, the Plaintiff was sentenced to 293 months incarceration. ECF No. 126-2 at 5. The Plaintiff received executive clemency,  and his new sentence imposed was for a term of 21 years, 1 month and 2 days. <u>Id.</u> The Plaintiff was committed to the custody of the BOP on March 30, 2004. <u>Id.</u> On June 26, 2012, the Plaintiff was assigned to the minimum security camp within the Federal Correctional Complex in Hazelton, West Virginia. ECF Nos. 126-2 at 2, 9.

On February 16, 2013, a random search of the Plaintiff by a correctional officer yielded a  black Tracphone in the right front pocket of the Plaintiff's sweatpants. ECF No. 94-26 at 1. When asked if it was his, the Plaintiff stated it was. <u>Id.</u> at 94-13 at 3. An incident report was prepared on February 16, 2013, charging the Plaintiff with violation of Prohibited Act 108, possession of a hazardous tool (cell phone). ECF No. 94-26 at 1. The incident report was delivered to the Plaintiff at 9:50 pm that same date. <u>Id.</u> On February 20, 2013, the Plaintiff was transferred to the Special Housing Unit ("SHU") at FCI Morgantown. ECF No. 126-2 at 9.

On February 28, 2013, the issue of the phone was referred to United States Attorney for investigation. ECF No. 94-26 at 3.   On March 1, 2013, Defendant Duranko, a Special Investigation Services Technician at FCI Morgantown, interviewed the Plaintiff

in the SHU. At the beginning of the interview, Defendant Duranko advised the Plaintiff of his Miranda rights from a pre-printed form. The  Plaintiff signed the form, which was witnessed by Defendant Duranko and Correctional Officer McCollum. ECF No. 94-26 at 5. Prior to questioning the Plaintiff, Defendant Duranko completed a financial affidavit for an attorney, which the Plaintiff signed.[6] ECF No. 94-15 at 1. Defendant Duranko then proceeded to question the Plaintiff and memorialized his statements in an affidavit. In the affidavit, the Plaintiff admitted that a cell phone was found in his pocket. He stated that he got the cell phone on the compound and used the cell phone to call his mother, his girlfriend and his brother. ECF No. 94-25 at 6.  Following the interview, Defendant Duranko forwarded the material to the United States Attorney's office.

On March 13, 2013, Defendant Flower sent a letter to former United States Magistrate Judge John Kaull. The letter indicated that based on reports of an investigation conducted by the BOP Special Investigative Services, it appeared appropriate  to file an information charging the Plaintiff with possession of contraband in violation of 18 U.S.C. §§ 1791(a)(2) and (b)(4). The letter further indicated Defendant Flower's opinion that the interest of the Plaintiff and the government, as well as the interest of judicial economy might be advanced by trying to reach an agreement prior to filing an information. Accordingly, Defendant Flowers enclosed the Plaintiff's financial affidavit and requested that counsel be appointed to assist in the process. See ECF No. 1 (1:13cr-58).  By Order entered March 19, 2013, the court appointed L. Richard Walker, Federal Public Defender, to represent the Plaintiff. See ECF No. 3 (1:13cr58).

---

[6] According to records contained in Criminal Action No. 1:13cr58, Defendant Duranko presented this document to the Plaintiff at the request of the government  to attempt a pre-charge resolution to the case. ECF No. 30 at 8. The form is not a BOP form, but instead, is a CJA form used by the Federal Court to determine a defendant's eligibility for appointed counsel.

On March 25, 2013, the United States tendered a plea agreement to the Plaintiff which was rejected. Because  the parties could not reach a pre-charge plea agreement, the United States filed an information against the Plaintiff on July 22, 2013. See  ECF No. 4. (1:13cr58).  On August 26, 2013, Magistrate Judge Kaull granted the Plaintiff's oral motion to represent himself, relieved Richard Walker as counsel and appointed him as stand-by counsel. See ECF No. 14 (1:13cr58). On October 9, 2013, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, and by leave of court, the criminal case against the Plaintiff was dismissed with prejudice because "the defendant provided potentially exculpatory evidence that calls into doubt the credibility of evidence developed by the United States." See ECF No. 40 (1:13cr48).

### 1.  Brandon Flower

Prosecuting attorneys are immune from individual liability when performing prosecutorial functions. Imbler v. Pachtman, 421 U.S. 409 (1976); Ostrzenski v. Seigal, 177 F.3d 234 (4th Cir. 1999). As this Court has previously noted, "[p]rosecutors enjoy absolute immunity from civil liability for prosecutorial functions such as, initiating and pursuing a criminal prosecution, presenting a case at trial, and other conduct that is intricately associated with the judicial process. . . . it has been said that absolute immunity cannot be defeated by showing that the prosecutor acted wrongfully or even maliciously, or because the criminal defendant ultimately prevailed on appeal or in a habeas proceeding." Alderman v. Price, 2012 WL 12906283, at *4 (N.D.E. Va. December 14, 2012).

There is an exception to the absolute prosecutorial immunity rule, however, if the prosecuting attorney acts in the role of administrator or investigative officer, rather than

as a prosecutor. <u>Imbler</u>, 424 U.S. at 430. Therefore, when a court considers whether a prosecuting attorney is entitled to absolute immunity, it must examine the type of activity performed, not the identity of the individual who performed it. <u>Forrester v. White</u>, 484 U.S. 219, 229 (1988).

Upon review of the Plaintiff's complaint, the undersigned finds that the allegations involve Flower's acting in his role as a prosecutor and advocate for the Government that occurred during the performance of his prosecutorial functions. Therefore, he is entitled to absolute immunity, and the Plaintiff's complaint fails to state a claim for relief against him.

## 2. Sweeney, Ervin, Craddock and O'Brien

As previously noted, the Plaintiff alleges several violations of his Due Process and Sixth Amendment rights with respect to his interview by Duranko at FCI Morgantown, the financial affidavit for appointment of counsel, and evidence that was submitted to support charges filed in the information.

First, the Plaintiff alleges that Duranko's interview violated his Constitutional rights because "Duranko gave no indication that he had been actually sent to conduct an interview on behalf of Brandon Flower and  the United States of America nor that the basis of the interview was to gather information for the United States at the direction of the United States." ECF No. 94-2 at 14. In addition, the Plaintiff maintains that under Bureau of Prison Rules and the Code of Federal Regulations, once there is an inquiry of a criminal nature, the Bureau of Prisons must halt its investigation until the United States Attorney or the Federal Bureau of Investigation completes its process.[7] ECF No.

---

[7] BOP  Program Statement 5270.09 does provide that when it appears likely that the incident may involve criminal prosecution, the investigating officer suspends the investigation and  staff

132 at 5.  Notably, the Plaintiff raised similar arguments in his motion to dismiss his criminal case. <u>See</u> ECF No. 10 (1:13cr58).

      In response, Mr. Flowers stated that in the Northern District of West Virginia, the FBI has chosen to limit the number of cases it accepts for investigation from the BOP. Although the FBI continues to accept referrals for prison homicides, Mr. Flowers averred that the FBI declines all other matters and defers to the BOP to handle investigations of cases referred for prosecution. As a result, the FBI and the United States Attorney's Office agreed that the BOP would send referrals directly to the United States Attorney's Office for consideration of prosecution. Accordingly, non-homicide investigations are handled by the SIS units in each correctional facility. Mr. Flowers noted that this arrangement is not inconsistent with any BOP policies, and SIS Tech Duranko had authority to assist the SIS Unit at USP Hazelton in its investigation. <u>See</u> ECF No. 31 at 4 (1:13cr58).

      Furthermore, in the criminal case, the United States conceded that the statement obtained by Duranko was obtained following the Plaintiff's written request for an attorney. Therefore, the United States could not use those statements for any purpose other than impeachment. ECF No. 30 at 3 (1:13cr58). Because the case was eventually dismissed, any improper procedure followed by Duranko during his questioning of the Plaintiff was rendered moot.

      In addition, the Plaintiff alleges the form which he signed requesting an attorney was not  properly completed. He alleges that Duranko completed the request for

---

may not question the inmate until the FBI or other investigative agency releases the incident for administrative processing. This provision clearly provides that the internal BOP disciplinary process is suspended while the criminal investigation is ongoing. However, it does not prohibit SIS from conducting interviews at the request of the United States in aid of its prosecution of prison crimes. <u>See</u> PS 5270.09 § 541.5(b) (available at www.bob.gov).

attorney form, but the top portion of the form was not completed. He maintains that the top portion of the form[8] was completed by AUSA Flower and submitted to the Court purportedly by authorization of the Plaintiff. However, the Plaintiff alleges AUSA Flowers submitted it to the Court, so he could attempt to negotiate a plea bargain with appointed counsel in advance of any criminal charges being filed. ECF No. 94 at 14. The Plaintiff maintains that "the criminal process would clearly provide that an indictment or information be filed **prior** to the appointment of counsel. ECF No. 132 at 8 (emphasis in original).

Again, the Plaintiff cites no support for this contention. Furthermore, the Plaintiff filed a *pro se* Motion to Dismiss his criminal case on August 26, 2013, and an Amended Motion on September 5, 2013, alleging prosecutorial misconduct and raising these same claims. ECF Nos. 10, 20 (1:13cr58). In response, AUSA Flowers indicated that the action of obtaining  an affidavit for an attorney was no different that in the other numerous criminal matters arising out of the Federal correctional facilities in the Northern District of West Virginia. Flowers continued by noting that in an effort to resolve cases expeditiously for defendants, the United States, and the court, the United States attempts to secure counsel for inmates and negotiate pre-indictment or pre-charge plea agreements which he pointed out provides multiple benefits: (1) the defendant receives the benefit of a quick plea agreement, usually binding in nature, that provides a below guideline sentence; (2) the United States receives the benefits of a quick disposition that saves time and resources; and (3) the courts benefit by a docket

---

[8] The top portion contains the Plaintiff's name, the charge of Possession of a Prohibited Object (Cell phone), 18 U.S.C. 1791(a)(2) & (b)(4) and the indication that the offense is a misdemeanor.

that is less congested by the disposition of prison matters in one efficient hearing. ECF No. 31 at 3 (1:13cr58).

Finally, it is pertinent to note that on March 14, 2013, a Target Letter was sent to former United States Magistrate Judge Kaull informing him that reports from the BOP Special Investigative Services had been referred to him for prosecution, and based on those reports AUSA Flower had concluded that it might be appropriate to file an information charging the Plaintiff with possession of contraband (cell phone), in violation of 18 U.S.C. 1791(a)(2) & (b)(4). The Target Letter continued that the interest of the Plaintiff and the government, as well as the interest of judicial economy, might be advanced by trying to reach an agreement prior to filing an information. Accordingly, AUSA Flower attached the CJA 23 Financial Affidavit for the Plaintiff and requested that counsel be appointed. ECF No. 1 (1:13cr58). On March 19, 2013, Magistrate Judge Kaull entered an Order appointing the Federal Public Defender to represent the Plaintiff. Clearly, the Court approved the procedures used in obtaining the affidavit and the reasons for obtaining the same. The Plaintiff simply cannot establish a constitutional violation with respect to the affidavit.

Finally, the Plaintiff alleges that Defendants Ervin, Craddock, O'Brien and Sweeney forged a Bureau of Prisons form and provided it to AUSA Flower in support of the criminal prosecution. The form in question is the Intake Screening Form. There does not appear to be any dispute that when inmates arrive from another institution the usual processing includes asking them a series of questions to assess their safety and giving them an A&O handbook, which describes their rights and responsibilities. The Intake Screening Form has a section where both the inmate and case manager sign to

acknowledge the inmate's receipt of the handbook. Presumably, this handbook would advise the Plaintiff that it is a violation of BOP policy to have a cell phone in his possession.

The dispute in this case arises from the existence of two intake forms each bearing Plaintiff's signature and that of Defendant Craddock, who was a case manager at FCC Hazelton. The forms are identical save for one distinction. The form which was provided to AUSA Flowers[9] contains a circle indicating that the Plaintiff received a "Bureau of Prisons Admissions & Orientation Booklist' Defining My 'Rights & Responsibilities' And "Prohibited Acts and Disciplinary Scale." ECF No. 94-6 at 1. The other form contains no circle. ECF No. 94-3 at 1.

In response to the Plaintiff's allegations that the form was forged with the circle, Defendants Sweeney, Craddock, Ervin and O'Brien have each provided a Declaration in which they individually deny falsifying or forging any intake form. ECF Nos. 126-3, 126-4, 126-5, and 126-6.  However, the criminal case was dismissed after the Plaintiff produced a copy of his intake form which does not have the circle and, therefore, provided "potentially exculpatory evidence that calls into doubt the credibility of evidence developed by the United States." ECF No. 40 (1:13cr58).

The Plaintiff cannot establish who was responsible for the discrepancy in the forms and because the charges were dismissed, no damages resulted therefrom.

---

[9] The undersigned has searched the criminal docket in 1:13cr-58 and cannot find any version of the Inmate Screening Form filed of record.  However, the Defendants have attached a Declaration from James Ervin, who was employed as a Case Manager at FCC Hazelton, and was responsible  for referring the criminal case to the AUSA for possible prosecution. After the case was accepted, part of the Plaintiff's defense was that he never received a copy of the rules and regulations of the institution. According to his Declaration, Ervin pulled the Plaintiff's Central file, found a copy of his signed A&O paperwork and took it to the AUSA.

Although how two nearly identical forms came to be in existence is unresolved,[10] the undersigned believes because the charges were dismissed, the Plaintiff's allegation with respect to forgery of the intake form fails to state a viable claim of a constitutional violation sufficient to sustain a <u>Bivens</u> cause of action.

## C.  Bivens-Retaliation

The Plaintiff alleges that while he was housed at FCI Morgantown, Defendant Sweeney changed or caused his custody and security level to be changed. He also alleges that his "living skills' and "programming" were changed from "good" to "average" despite no just cause for such change. The Plaintiff maintains that this "retaliatory" action was intended to ensure that he was subjected to a higher security transfer under "close supervision." The Plaintiff also alleges that Defendant Ervin authored a SIS report indicating that he was released back to camp, he would "continue to break policy and obtain another cellular phone."  Finally, the Plaintiff asserts that all these actions were "effectuated as retaliation for Plaintiff wishing to assert his First and Sixth Amendment rights and as a result of Plaintiff informing the United States Attorney that the Defendant[s] were incompetent, fleckless, individuals who were readily identifiable as maladroit in their official and individual capacities." ECF No. 94 at 17.

A prisoner has no right to be incarcerated in a certain facility, even if life in one prison may be much more disagreeable than in another. <u>Olin v. Wakinekona</u>, 461 U.S. 238, 245 (1983).  Furthermore, a prisoner has no protected constitutional interest in

---

[10] Although not mentioned by the parties, the undersigned notes that both copies of the form have what appears to be a line through the phrase "HAVE NOT", which leads to the following reading: I have received a Bureau of Prison…. Because the form's instruction directs that one phrase be circled, it is not beyond speculation that the Plaintiff crossed out Have Not, and some individual having responsibility for the Plaintiff's Central File simply circled I HAVE to bring the form into compliance with the specific instructions.

being housed in a particular institution or at a particular custody level. <u>Moody v. Daggert</u>, 429 U.S. 78, 88 n.9 (1976). Nor does a prisoner have a constitutional right protecting him from transfer from one facility to another. <u>See</u> <u>O'Brien v. Pinion</u>, 953 F.2d 74, 84 (4th Cir. 1991).  Additionally, any complaint of a change in security or custody classification cannot establish a constitutional violation because "prison officials can change an inmate's classification for almost any reason or no reason at all." <u>Brown v. Ratledge</u>, 2017 L 4404248 at *7 (W.D. Va. Sept. 29, 2017) <u>aff'd</u> 709 F. App'x 215 (4th Cir. 2018). It is only when a prisoner can demonstrate that challenged transfer or custody classification would "inevitably affect the duration of his sentence" or impose "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" that he can state a cognizable constitutional violation. <u>Sandin v, Conner</u>, 515 U.S. 472, 483-84 (1995).

In the instant case, the Plaintiff simply complains that changes were made without any basis and for the purpose of retaliation. However, he makes no allegation that any change subjected him  to conditions that imposed atypical and significant hardships, nor that any change affected the duration of his sentence. Accordingly, his allegations regarding his custody classification, programming and transfer fail to state a viable <u>Bivens</u> cause of action.

## D.  <u>FEDERAL TORT CLAIM</u>

The United States enjoys sovereign immunity except to the extent that Congress has waived such immunity by enacting the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* The FTCA provides in § 2674 that:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same

extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

Jurisdiction for violations of the FTCA is governed by 28 U.S.C. § 1346 which

provides in subparagraphs (b)(1) and (b)(2):

(b)(1) [T]he district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

(b)(2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or any agency, officer, or employee of the Government for mental or emotional injury suffered while in custody without a prior showing of a physical injury.

The FTCA waives the Government's traditional immunity from suit for claims based

on the negligence of its employees. The Act also "permits the United States to be held

liable in tort in the same respect as a private person would be liable under the law of the

place where the act occurred." Medina v. United States, 259 F.3d 220, 223 (4th Cir.

2001). The Government cannot be sued, however, unless Congress has waived the

Government's sovereign immunity and authorized suit under the FTCA. Dalehite v.

United States, 346 U.S. 15, 30-31 (1953).

Even where the government has waived sovereign immunity, the FTCA only

authorizes lawsuits against the United States itself. 28 U.S.C. § 1346(b). Therefore, the

United States, not any government employee or agency is the only proper defendant in

an FTCA lawsuit. See 28U.S.C. 2679(a); Webb v. Hamidullah, 281 F. App'x 159, 161 n.

4 (4th Cir. 2008) (per curiam) (unpublished) (United States is the only proper defendant

in FTCA claim); <u>Holmes v. Eddy</u>, 341 F.2d 477, 480 (4th Cir. 1965) (per curiam) (federal agency cannot be sued pursuant to the FTCA); <u>Allfgeir v. U.S.</u>, 909 F.2d 869 (6th Cir. 1990) ("The FTCA clearly provides that the United States is the only proper defendant in a suit alleging negligence by a federal employee").

A constitutional civil rights claim is not cognizable in an FTCA lawsuit. <u>FDIC v. Myer</u>, 510 U.S. 471, 477-79 (noting that a constitutional tort claim is not cognizable in an FTCA lawsuit because the United States has not waived its sovereign immunity with respect to constitutional tort allegations); <u>Blanchard v. United States</u>, No. 2:14cv58, 2015 WL 4107311, at 13 (N.D.W. Va. July 7, 2015), <u>aff'd</u> 622 F. App'x 287 (4th Cir. 2015) (per curiam) (unpublished) (finding that a civil rights claim alleging a violation of the Eighth Amendment prohibition against cruel and unusual punishment is not actionable against the United States in an FTCA lawsuit because a constitutional tort claim is not cognizable under the FTCA.

As previously noted, in his FTCA complaint, the Plaintiff reiterates the claims alleged in his <u>Bivens</u> complaint. Specifically, he alleges that his First Amendment rights were violated when he was not permitted to publish under a byline or to publish under a byline on the Internet. In addition, the Plaintiff alleges that employees of the BOP forged court documents to secure a criminal conviction and improperly investigated a criminal matter. In describing his injury as the result of these two claims, the Plaintiff alleges that he incurred costs associated with legal fees, appears to allege that he lost potential income from sales of the manuscripts of these articles, suffered deprivation of his First, Fifth and Sixth Amendment rights, and he suffered emotional distress as well.

Although the Plaintiff alleges negligence on the part of various defendants, the foundation of his claims under the FTCA are violations of his constitutional rights. Accordingly, he fails to state a valid claim for relief under the FTCA, and his complaint under the FTCA should be dismissed.

Moreover, to the extent the Plaintiff alleges that his complaint is being pursued pursuant to 28 U.S.C. § 1346(2), and he can proceed because he is requesting an amount not exceeding $10,000, his argument is misguided. That section of the Code provides as follows:

> (a) The district courts shall have original jurisdiction concurrent with the United States Court of Federal Claims, of:
>
> (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress…in cases **not sounding in tort**….

28 U.S.C. § 1346(a)(2) (emphasis added).

Although the undersigned has concluded that the Plaintiff's FTCA complaint is barred because he alleges a constitutional tort, it is clear that his complaint sounds in tort. He filed three administrative tort claims as a prerequisite to filing his Federal Tort Claim Act. Therefore, he cannot rely on 28 U.S.C. § 1346(a)(2) to avoid dismissal.

## <u>RECOMMENDATION</u>

For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' Motion to Dismiss or, in the alternative, Motion for Summary Judgment [ECF No. 126] be **GRANTED**, and this case be **DISMISSED WITH PREJUDICE**.

Within 14 days of service of this Report and Recommendation any party may file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of**

**such objection.**  A copy of such objections should also be submitted to the United States District  Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page  limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to send a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means. In addition, because this Report and Recommendation completes the referral from the District Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATED: July 26, 2019.


*/s Robert W. Trumble*

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE